J-S77032-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: A.R. & B.R., MINORS | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: B.R., FATHER | No. 920 MDA 2016 |

Appeal from the Orders Entered May 10, 2016
in the Court of Common Pleas of Adams County
Orphans' Court at Nos.: RT-2-2016(A)
RT-3-2016(A)

BEFORE: PANELLA, J., OLSON, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                    **FILED DECEMBER 12, 2016**

In these consolidated appeals, B.R. (Father) appeals the orders of the Court of Common Pleas of Adams County, entered May 10, 2016, that terminated his parental rights to his daughter, A.R., born in September of 2011, and his son B.R., born in September of 2012 (Children), and changed the Children's goals to adoption.[1]  We affirm.[2]

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The trial court appears to have consolidated these cases administratively, without notice on the docket.  We note that although this appeal arose from two separate orders entered in the trial court relating to each child, Father apparently filed one notice of appeal that referenced both docket numbers.  While this practice is generally discouraged, **see General Electric Credit Corp. v. Aetna Casualty and Surety Co.**, 263 A.2d 448, 452-53 (Pa. 1970), we will overlook this procedural misstep.  We also note that if Father had filed separate notices of appeal from the decision as to each child, this
*(Footnote Continued Next Page)*

Adams County Children and Youth Services (CYS) filed petitions to terminate Father's parental rights to the Children on March 4, 2016.[3] The trial court aptly summarized the events that led CYS to file those petitions in its opinion entered July 6, 2016. We direct the reader to that opinion for the facts of this case.

The trial court held a hearing on CYS' petitions on May 4, 2016. Testifying at that hearing, in addition to Mother and Father, were CYS caseworkers Carolynne Saum and Karen Rose; Central Pennsylvania Support Services Caseworker Amy Hull; and the Children's Foster Mother, J.K. The trial court took additional testimony on May 10, 2016, when Ms. Saum testified regarding the Children's best interests and welfare, and where, after a short adjournment, the trial court read its findings of fact and announced its decision to terminate Father's parental rights. The trial court entered its orders terminating Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8) and (b) on May 10, 2016. Father filed a single notice of appeal and statement of errors complained of on appeal

_(Footnote Continued)_ —————————

Court would have consolidated those appeals for the convenience of the panel and the parties. *See* Pa.R.A.P. 513.

[2] T.M. (Mother) voluntarily relinquished her parental rights shortly after the filing of the petition to terminate her parental rights. (*See* Trial Court Opinion, 7/06/16, at 8). Mother did not file an appeal and she is not a party to this appeal.

[3] B.R. is Father's biological son. A.R. is not Father's biological child, but he is listed as her father on her birth certificate.

referencing both B.R. and A.R's docket numbers on June 6, 2016.  **See**

Pa.R.A.P. 1925(a)(2)(i).[4]

Father raises the following questions on appeal:

1. Did the trial court err in determining that [CYS] demonstrated by clear and convincing evidence that Father has evidenced a settled purpose of relinquishing his parental claims to the [Children] and/or has refused to perform parental duties pursuant to 23 Pa.C.S.A. 2511 §[](a)(1)?

2. Did the trial court err in determining that [CYS] demonstrated by clear and convincing evidence that the [Children were] removed from Father's care by Order of Court for a period of at least six months, the conditions which led to the removal continue to exist, Father cannot or will not remedy those conditions within a reasonable period of time, services reasonably available to him are not likely to remedy those conditions within a reasonable period of time, and termination of his parental rights would best serve the need and welfare of the child pursuant to 23 Pa.C.S.A §[]2511(a)(2) and 23 Pa.C.S.A. §[]2511(a)(5)?

3. Did the trial court err in determining that [CYS] demonstrated by clear and convincing evidence that since the [Children were] removed from Father's care by Order of Court, [twelve] months or more have elapsed, the conditions which led to the removal continue to exist and that termination of his parental rights would best serve the needs and welfare of the [Children] pursuant to 23 Pa.C.S.A. §[]2511(a)(8)?

(Father's Brief, at 4).

Our standard of review is as follows:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence

---

[4] The trial court entered an opinion on July 6, 2016.  **See** Pa.R.A.P. 1925(a)(2)(ii).

presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

The trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b). In order to affirm the termination of parental rights, this Court need only agree with any one subsection of Section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Requests to have a natural parent's parental rights terminated are governed by 23 Pa.C.S.A. § 2511, which provides, in pertinent part:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

It is well-settled that a party seeking termination of a parent's rights bears the burden of proving the grounds to so do by "clear and convincing evidence," a standard which requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re T.F.*, 847 A.2d 738, 742 (Pa. Super. 2004) (citation omitted).  Further,

[a] parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship.  Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's

- 5 -

parental responsibilities while others provide the child with his or her physical and emotional needs.

*In the Interest of K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (citation omitted).

To terminate parental rights pursuant to section 2511(a)(1), the person or agency seeking termination must demonstrate through clear and convincing evidence that, for a period of at least six months prior to the filing of the petition, the parent's conduct demonstrates a settled purpose to relinquish parental rights or that the parent has refused or failed to perform parental duties. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

With respect to section 2511(a)(1), our Supreme Court has held:

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 92 (Pa. 1998) (citation omitted). Further,

> the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (citations omitted).

The Adoption Act provides that a trial court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). The Act does not make specific reference to an evaluation of the bond between parent and child but our case law requires the evaluation of any such bond. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). However, this Court has held that the trial court is not required by statute or precedent to order a formal bonding evaluation performed by an expert. *See In re K.K.R.-S*., 958 A.2d 529, 533 (Pa. Super. 2008).

We have examined the opinion entered by the trial court on July 6, 2016 in light of the record in this matter and are satisfied that the opinion is a complete and correct analysis of this case. Accordingly, we affirm the orders of the Court of Common Pleas of Adams County that terminated Father's parental rights and changed the Children's goals to adoption, on the basis of the trial court's opinion.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/12/2016

- 7 -

IN THE COURT OF COMMON PLEAS OF ADAMS COUNTY, PENNSYLVANIA
ORPHANS COURT

IN THE INTEREST OF:

B.R.                                                    RT-2-2016(A)
A.R.                                                    RT-3-2016(A)

### OPINION PURSUANT TO Pa. R.A.P. 1925(a)

B.R. ("Father") appeals this Court's Order terminating his parental rights to his children, B.R. and A.R.[1] For the reasons set forth below, it is respectfully requested that the Order terminating Father's parental rights be affirmed.

B.R. was born on September ▲, 2012. A.R. was born on September ▲ 2011.[2] Both children were taken into protective custody by Adams County Children and Youth Services ("ACCYS") on January 2, 2015 and have continuously remained in placement through ACCYS since that date. The protective custody followed initial interaction with the agency beginning October 22, 2014. At that time, ACCYS received a referral concerning the adequacy of the children's living arrangements. In addition to housing issues, there were other concerns including heroin use by their biological mother, T.M. ("Mother"), and the unavailability of adequate child care while Father worked. At the time, the children were living with Father and Mother. The family faced imminent eviction and was ultimately evicted on November 17, 2014. Following eviction, Father and Mother moved into a camper owned by a friend. The

---

[1] B.R. is Father's biological son. Father is not biologically related to A.R. however is listed on A.R.'s birth certificate as her father.

[2] Factual references are based upon this Court's notes of the May 4, 2016 proceeding as an official transcript of that proceeding was not properly requested by counsel. *See* Pa. R.J.A. No. 4007 (requiring service of the request for transcript on the court reporter). By separate Order of Court, this Court has dictated a transcript of the May 4, 2016 proceeding be promptly prepared and filed of record.



7/7/16 9:05 Am MK COPIES TO:
ACCYS - INTEROFFICE
M TANGUAY, ESQ - INTEROFFICE
SINGLEY, ESQ - ATTY BOX
James, ESQ - ATTY BOX



ORIGINAL

SCANNED

camper however was inadequate for the well-being, health, and safety of the children as it lacked reliable utility service, heat, and water. Additionally, the camper lacked an adequate space to accommodate the children's needs. Accordingly, ACCYS worked out a plan for the children's safety with all involved family members which resulted in the children remaining with family members but separated from each other. The child, A.R., moved in with her paternal grandparents. B.R. was placed with a paternal aunt and uncle. Family group decision making conferences were held on December 5, 2014, and January 2, 2015. At the December 5, 2014 meeting, Father agreed to develop a viable plan for the care of the children during his frequent and lengthy unavailability caused by his work schedule as Mother's addiction to heroin precluded her as a provider. During the January 2, 2015 family group meeting, ACCYS was advised by the paternal grandparents that they were no longer willing to provide for the care of A.R. On that same date, a protective custody order was entered giving physical and legal custody of the children to ACCYS as Father and Mother had not stabilized their living arrangements but rather were living in a homeless shelter.[3] Additionally, Father had not developed a child care plan and Mother's addiction remained a concern for her ability as a provider.

On January 20, 2015, due to the reasons which prompted the emergency custody order, the children were adjudicated dependent and placed in separate kinship foster care in the custody of ACCYS. On February 17, 2015, a dispositional hearing was conducted. At that time, Father was directed to participate and complete

---

[3] The Honorable John Kuhn presided over all dependency proceedings in this matter from the initial petition until his retirement on December 31, 2015. Thereafter, he conducted a status review as Senior Judge on January 19, 2016. All proceedings subsequent to that date have been conducted by your undersigned.

2

parenting classes; develop a plan to provide supervision for the children when he was unavailable; participate in in-home family support services with Pressley Ridge; attend scheduled visits with the children; attend the children's medical and educational appointments; learn age appropriate discipline for the children; undergo drug and alcohol evaluation and comply with treatment recommendations; obtain housing and financial stability by May 30, 2015; resolve outstanding utility bills by June 30, 2015 so he could obtain utility services at his residence; make efforts to restore his motor vehicle operating privileges; begin making payment toward satisfying outstanding criminal fines the nonpayment of which presented issues concerning operating privilege restoration and potential incarceration; and refrain from interacting with known drug users. During hearing, the Court identified a placement goal of reunification with the parents.

The Court conducted a status review on April 9, 2015. At the review, the Court was advised that on February 25, 2015, services provided by Pressley Ridge to Father were closed due to Father's inability and/or noncompliance with the scheduling of appointments. Additionally, although Father appeared to be making efforts towards reunification, several issues remained unresolved. On the positive side, Father participated in regular visits with the children and made effort to attend the children's medical and educational appointments. He also underwent a drug and alcohol evaluation which determined that no drug and alcohol services were necessary. The evaluation appeared accurate as he subsequently passed random testing for controlled substances. Father also claimed to have entered into a payment agreement on his outstanding criminal fines.

3

On the other hand, Father's housing and economic circumstances had not improved. Following a temporary separation, he and Mother reconciled and, at the time of the status conference, had moved from the homeless shelter into temporary housing at a motel. He had not taken any steps to restore his operating privileges nor towards resolving the overdue utility bills. Additionally, little effort had been made in obtaining and identifying child care services when he was unavailable due to work obligations. Although Mother's potential as a resource had improved as she had completed inpatient drug treatment, she had not yet stabilized to the extent of being a viable resource. As a result, following the status review, the children remained in kinship foster care at separate residences.

On May 8, 2015, after receiving notice from the kinship foster providers for both children as to their unwillingness to continue to provide care, the Court ordered the children to be placed together in a new foster care setting. On June 9, 2015, the Court conducted a permanency hearing. The housing situation had not improved as Father and Mother continued to reside in a motel. Additionally, Father had made no further effort to address his transportation issues and was refusing to participate in parenting classes. Otherwise, based on the parties' representations, the Court determined the Father and Mother were making reasonable effort to comply with the established plan. The children remained in foster care placement.

At the time of status review conference conducted by the Court on September 15, 2015, the parents' compliance with the plan had deteriorated. It was noted the Father had participated in only 21 of the 30 scheduled visits. Additionally, he had failed to take any efforts to restore his license and/or obtain transportation. To the·

4

contrary, he was arrested for an incident on August 10, 2015, where he was suspected of driving under the influence of alcohol and operating an unregistered and uninspected vehicle. Additionally, Father had been cited in separate incidents for motor vehicle violations one of which resulted in his vehicle being impounded by law enforcement authorities. Father still had not attended parenting services as directed by the Court's February 17, 2015 Order. Despite regular employment, Father had failed to address outstanding utility bills and had not obtained stable housing as he continued to reside in a temporary residence at a local motel. His efforts to obtain a housing voucher were denied due to his income exceeding the guideline levels. Although he had entered into a payment plan for outstanding criminal fines, those fines had actually increased due to his numerous traffic violations. Mother and Father had again separated leaving unresolved the issue of a care provider while Father was unavailable due to work obligations. There were also indications that Mother had relapsed. Alarmingly, at the time of the status conference, it appeared the children's behavior in foster care had also deteriorated. The Court was advised that B.R. had become more aggressive than usual and was taking out his aggression through physically hitting siblings and foster parents.

During the fall of 2015, ACCYS became concerned over the length of the children's placement without significant progress towards reunification on the part of the parents. By letter dated August 27, 2015, ACCYS advised Father of their expectations for reunification. Those expectations, substantially similar to the originally identified plan, included obtaining and maintaining stable and safe housing for the children; participating in medical, dental, and other appointments for the

children; and developing parenting skills to ensure for the children's safety and well-being. During this time, it was apparent Mother had relapsed and that her visits with the children were emotionally impacting the children. ACCYS expressed concern to Father about his participation in arranging surreptitious visits between Mother and children.

On November 7, 2015, a family group decision making plan was established. During the meeting establishing the plan, discussions with Father occurred concerning the negative impact which Mother's visits and behaviors had on the children. Among the terms agreed to by the parties was Father's representation that he would participate in establishing boundaries and limitations on Mother's visits with the children and cooperation with ACCYS in that regard. Additionally, Father promised to submit application for occupational limited license by November 14, 2015.

A permanency review hearing was held on November 9, 2015. At that time, Father remained living at a local motel and had not made any progress toward permanent housing. Additionally, he made no effort to address his outstanding utility bills. His operating privileges remained under suspension. Although he claimed, once again, to be looking at the possibility for obtaining an occupational limited license, no effort had been made to move forward in obtaining one. Additionally, Father had attended less than half of his scheduled visits as he had attended only six of the 13 scheduled visits occurring during the review period. Although Father began participation in family support services, as of October 1, 2015, he still refused to participate in parenting classes. During the permanency review hearing, ACCYS

6

renewed concern over Father's ability to provide supervision and care due to deficiencies in his discipline of the children and his attentiveness to their dietary needs during visits. A plan for care providers during Father's unavailability had still not been developed. Father also was unable to identify an ability to respond to emergency issues concerning the children should they arise while the children were in his custody as he had no means of transportation.

The lack of a long term placement also began taking its toll on the children. They were exhibiting increased aggression and tantrums as well as confusion concerning their circumstances. The foster parents noted the digression in behavior appeared related to the visitation schedule between the children and their parents with the most difficult behaviors occurring immediately following visits. As a result of the permanency review hearing, the children remained in the care and custody of the agency at their placement with foster parents. Notably, during the hearing, the Court discussed with Father the urgency of finding permanency for the children. Although the placement plan remained reunification, adoption remained a concurrent plan and was openly discussed with the parents.

On January 19, 2016, a status review conference was conducted. At that time, ACCYS advised the parents of their intent to file petitions to terminate their parental rights. Since the time of the most recent family group conferences, Father did not appear motivated to complete the tasks identified at those conferences. Father's housing remained unstable as he continued to live at the temporary residence at a local motel. He had not taken any steps to obtain his occupational limited license. ACCYS noted their continued concerns about Father participating in

covert contacts between the children and Mother and the negative emotional impact of Father's continued relationship with Mother despite Father's claims to the contrary.[4] Although Father was participating in visitations with the children, overnight visitations had not commenced due to Father's unwillingness and/or inability to provide a plan to provide care for the children in the event of an emergency. Father did not attend any medical or dental visits for the children despite those visits being scheduled during evening hours when Father would be available. Father claimed at the hearing that he was researching childcare providers and was prepared to enter into an apartment lease. Subsequent to the status review conference, Father provided the agency with proof of a three-month apartment lease. He also provided copies of notes concerning his effort to obtain daycare services for the children. On March 4, 2016, ACCYS filed a Petition to Terminate Parental Rights of Mother and Father.

Following the filing of the petition, Mother voluntarily relinquished her parental rights to both children. In addition to the information provided at the previous status conference, hearing testimony reflected:

1. Contrary to his representations to ACCYS, Father permitted Mother to attend a visit with the children in mid-April, 2016;
2. When the children returned from visits, they reported to the foster parents that Father had transported them without carseats, and they had gone to pick up Mother on occasion;
3. During a recent visit, both children defecated in their pants while with Father;
4. The foster parents were no longer willing to serve as a placement resource for the children;
5. Prior to visits, the foster parents recognized B.R. as being extremely anxious and A.R. as expressing reluctance to go on the visits;

---

[4] Agency suspicions were confirmed at the termination hearing held on May 4, 2016, wherein Mother and Father both confirmed that Mother is currently pregnant with their child.

8

6. The children's behaviors continued to negatively escalate in relationship to the timeframe of visits;
7. The guardian ad litem expressed, on behalf of the children, agreement with termination of Father's rights;
8. Father had entered into a more permanent lease;
9. Father was subsequently convicted for driving under the influence of alcohol for the August, 2015 incident, and is facing 30 days of incarceration; and
10. Father had not yet attended parenting class.

Based upon the foregoing, this Court terminated Father's rights to his children under 23 Pa. C.S.A. § 2511(a)(1) (continued conduct of refusing or failing to perform parental duties for a period of at least six months immediately preceding the filing of petition); 23 Pa. C.S.A. § 2511(a)(2) (repeated and continued conduct causing the children to be without essential parental care; 23 Pa. C.S.A. § 2511(a)(5) (conditions leading to removal of children from care of parents have not been remedied for at least six months); and 23 Pa. C.S.A. § 2511(a)(8) (children removed from care of parents for 12 months or more, and conditions which led to removal continued to exist).

Recently, in *In Re Adoption of G.L.L.*, 124 A.3d 344 (Pa. Super. 2015), the Superior Court reiterated the burden and standard of proof necessary to terminate parental rights:

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

9

*Id.* A.3d at 346, *quoting In Re Adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003).

Initially, the focus of the proceeding is on the conduct of the parent. The party seeking termination must present clear and convincing evidence the parents' conduct establishes a statutory ground for termination under Section 2511(a) of the Adoption Act, 23 Pa. C.S.A. § 2101-2938; *In Re Adoption of C.J.P.*, 114 A.3d 1046, 1049 (Pa. Super. 2015). Only if the court makes such a finding does the court engage in determining the needs and welfare of the child under the standard of best interests of the child. *Id.* A major aspect of this latter determination is the nature and status of the emotional bond between the parent and the child with close attention given to the effect on the child of permanently severing any such bond. *Id.* A.2d at 1050.

Section 2511(a)(1) permits the involuntary termination of parental rights where a parent either exhibits a settled purpose of relinquishing his or her parental claim or refuses to perform parental duties for six months prior to the filing of a termination petition. 23 Pa. C.S.A. § 2511(a)(1). Although the six-month period immediately preceding the filing of the petition is most critical to the analysis, the court must consider the entire history of the case and not mechanically apply the six-month statutory provision. *In Re I.J.*, 972 A.2d 5, 10 (Pa. Super. 2009). In determining whether a parent has refused to perform parental duties, appellate courts have instructed that "[a] parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *In Re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004). Thus, the performance of parental duties is a positive duty

10

which requires affirmative performance. *In Re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003). It is a duty that requires continuing interest in the child and a genuine effort to maintain communication and association with the child. *Id.* The performance of parental duties is best understood in relation to the needs of the child and requires that a parent exert himself or herself to take and maintain a place of importance in the child's life. *Id.*

Instantly, the record is replete with evidence reflecting a pattern in excess of six months wherein Father subordinated the needs of his children to other interests. With full knowledge that the children's placement originated from inadequate safe housing, Father failed to take meaningful steps to remedy the situation for over a year. Critically, this isn't a circumstance where Father did not have the ability to improve his living circumstances. To the contrary, he had full-time employment. With effort and responsible budgeting, he had the means to meet the goal of obtaining suitable housing. Rather, Father intentionally or disinterestedly lacked motivation to address the housing issues at great detriment to his children's well-being.

Similarly, knowing that transportation and acquiring the ability to obtain utility service were critical dominos in his housing circumstances, Father ignored those issues. Indeed, rather than taking affirmative steps to obtain his operator's license and thus improve his ability to care for his children, he further jeopardized any ability to do so by driving under the influence of alcohol and committing additional traffic offenses. His repeated actions in driving illegally selfishly elevated his personal desires over the needs of his children.

11

Father was also sporadic, at best, in his effort to maintain communication with the children and generally displayed a lack of concern for their well-being. He repeatedly placed visitation with his children secondary to his employment needs. Although his explanation of a need to prioritize his job obligations in order to stabilize his housing and other issues might excuse his prioritization of obligations, it does not explain his lack of participation in medical and educational appointments involving the children which occurred during his non-work hours. More importantly, his claims of prioritizing issues rings hollow in light of the reality that he was not, in fact, stabilizing his housing which he claimed was the priority. To the contrary, the factual record reveals Father was not making an "exerted" effort to reunify with his children through such simple steps as scheduling visits with them during non-working hours.

More direct evidence of Father's refusal to perform parental duties may be found in his open defiance of the reunification plan, and the Court's directive, that he participate in parenting classes to assist him in best performing his parental duties. As early as February 17, 2015, the Court made Father aware of the concerns over his parenting skills and directed that he complete parenting classes by June 30, 2015. At the final status conference held over 11 months later on January 19, 2016, Father still had not attended the classes and was refusing to do so. This refusal remained firm despite ACCYS expressing concerns over his appropriate use of discipline and attentiveness to the dietary needs of the children as well as the urgency of the need for him to address those concerns.

Perhaps the most significant and critical action of Father consistent with a breach of parental duties was his willingness to jeopardize the emotional health of his

12

children for his personal needs. In April of 2015, ACCYS made Father aware of their concerns over Mother's ability to care for the children and the negative impact of her visitations with the children. Yet, Father continued to participate in a covert effort to continue those visits by hiding both the visits and his relationship with Mother from the agency. Importantly, as Father maintained a relationship with Mother, and otherwise discounted the expectations and goals set early on by the Court, the children's emotional well-being, and consequently their behavior, deteriorated.

Although it is true that at the time of the termination hearing Father claimed to have stabilized his residency and was going to make efforts to restore his operating privileges, obtain care providers for the children while at work, and prioritize the children's needs over his relationship with their mother, he falls short of having a definitive plan in any of those areas. Indeed, based on Father's history of making promises upon which he never followed through, the Court views those representations as hollow claims which ultimately only delay permanency for the children. "A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In Re Adoption of K.J.*, 936 A.2d 1128, 1133 (Pa. Super. 2007), citing *In Re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002). As insightfully noted by the ACCYS caseworker, throughout the pendency of this matter Father simply was unmotivated in attending to the physical and emotional needs of his children. Indeed, his casual approach to addressing the concerns affect the best interests of his children was tantamount to an attitude of treating the children as a

13

convenience to enjoy at his whim while others were required to tend to the responsibilities of providing for their daily needs and care.

In addition to finding a basis for termination of Father's rights under Section 2511(a)(1), the Court made similar findings under Sections 2511(a)(2), (a)(5), and (a)(8). In order to terminate parental rights under Section 2511(a)(2), the following three elements must be met:

(1)     repeated and continued incapacity, abuse, neglect or refusal;

(2)     such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and

(3)     the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In Re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination under this section may include acts of refusal as well as incapacity to perform parental duties. *In Re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002). As discussed in detail above, Father's housing and financial circumstances, as well as Mother's inability to serve as a care provider due to her addiction, caused the children to be without essential parental care, control, or subsistence necessary for their well-being. Despite having the ability to do so, Father failed to address those matters. More specifically, he outright refused, and continues to refuse, to attend parenting classes deemed essential by the Court to his role as a provider. Thus, by his own declared intent, the lack of parental care for the children will not be remedied.

The same reasoning set forth herein above is applicable to the findings under Section 2511(a)(5) and (a)(8). Although the Court's findings and reasoning are

14

applicable to both sections and will not be repeated, the Court's determination under Section 2511(a)(8) deserves brief further discussion.

In order to satisfy the requirements of Section 2511(a)(8), the petitioner must produce clear and convincing evidence that: (1) the child has been removed from the care of the parent for at least 12 months; (2) the conditions which led to the child's removal continue to exist; and (3) involuntary termination of parental rights would best serve the child's needs and welfare. *In Re Adoption of R.J.S.*, 901 A.2d 502, 511 (Pa. Super. 2006). Importantly, termination under this subsection does not require an evaluation of a parent's willingness or ability to remedy the conditions that led to the placement of the child. *Id.*

In regard to the first requirement under this statutory subsection, the children were in placement from January 2, 2015, through the date of filing of the termination petition on March 4, 2016; a period of 14 months. Accordingly, there is little dispute the agency has met this threshold requirement. Likewise, the record establishes that the conditions which led to the children's removal from Father continued to exist. As discussed exhaustively herein above, Father has done nothing more to remedy the circumstances which led to the children's placement other than to make promises of future conduct; promises which in the past have proved hollow.[5] As will be discussed below, termination will also serve the best interests of the children. Accordingly, termination of Father's rights under 2511(a)(8) is appropriate.

---

[5] Although he has now claimed to enter into a long-term lease, that action has clearly occurred subsequent to the filing of the termination petition and is properly precluded from consideration. *In Re Adoption of C.J.P.*, 114 A.3d 1046 (Pa. Super. 2015) (affirming statutory authority that a court shall not consider any effort by parent to remedy the conditions described initiated subsequent to the giving of notice of the filing of a termination petition).

15

Having found the existence of statutory requirements for involuntary termination of the Father's rights, consideration must also be given to whether the children's needs and welfare will be met by termination. Section 2511(b); *In Re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). This consideration includes consideration of "[i]ntangible such as love, comfort, security, and stability." *In Re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In doing so, the "utmost attention" should be paid to the emotional bonds between the parent and child and the effect on the child of permanently severing the parental bond. *Id.*

Undoubtedly, as recognized by the Court during the termination hearing, there is some evidence of a bond between Father and the children. Indeed, the Supreme Court very recently recognized that even the most abused child often harbors some positive emotion towards the abusive parent. *In Re T.S.M.*, 71 A.3d 251 (Pa. 2013). While instantly there is no evidence of physical abuse, the natural instinct of attachment between a parent and a child should not be confused with the intensive emotional bonding; severance of which would cause harmful impact upon the child. Instantly, this Court weighed the limited bonding of the children with Father at their early age in life. Weighing against a finding in Father's favor is the reality that the turmoil in the children's lack of stability over their lengthy placement in foster homes and the emotional harm thereby which has been caused to them. Children not only have a right to have proper parenting and fulfillment of their potential in a permanent, healthy, and safe environment, they have a need for the same. As such, vulnerable children cannot be expected to shoulder the emotional and physical toll, and perhaps permanent ramifications, of being shuffled from caregiver to caregiver without

16

permanency while a parent neglects their obligations until a more suitable or convenient time. Indeed, recognizing the negative impact which constant relocation was having on the children, the foster parents at the children's most recent placement urged the Court to take steps towards permanency for the children's well-being. Unfortunately, shortly before termination hearing, the children were required to be relocated once again. Nevertheless, ACCYS credibly represented that a permanent placement for the children had been found. It is this Court's conclusion that termination will improve the likelihood of finding a permanent adoptive home for the children. *See In the Matter of T.D.*, 949 A.2d 910, 922-23 (Pa. Super. 2008).

In sum, Father's cavalier disregard for the needs of his children over a lengthy period of time has caused significant issues for the healthy development of his children requiring this Court, after significant efforts to rectify the circumstances, to opt to sever Father's rights in favor of establishing long-term permanency for the children. As elegantly stated by Justice Baer, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail ... the result, all too often, is catastrophically maladjusted children." *In Re T.S.M.*, 71 A.3d 251, 269 (Pa. 2013).

For the foregoing reasons, it is respectfully requested that this Court's Order granting termination of the parental rights of Father be affirmed.

BY THE COURT:

_____
**MICHAEL A. GEORGE**
**President Judge**

Date filed: July 6, 2016

17